**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| BELIMED, INC.,                     ) | |
|                        ) | |
|          Plaintiff,         ) | |
|                        ) | No. 2:22-cv-00891-DCN |
|         vs.              ) | |
|                        ) | **ORDER** |
| JEFFREY BLEECKER,        ) | |
|                        ) | |
|         Defendant.       ) | |

This matter is before the court on plaintiff Belimed, Inc.'s ("Belimed") motion for temporary restraining order and preliminary injunction, ECF No. 4. For the reasons set forth below, the court denies the motion.

## I.  BACKGROUND

Belimed is a leading supplier of medical and surgical instrument sterilization, disinfection, and cleaning products and services used by hospitals, health care systems, and surgical centers across the world. Belimed's U.S. headquarters are in Ladson, South Carolina. Getinge, Inc. ("Getinge") is one of Belimed's primary competitors. According to Belimed, both Getinge and Belimed provide equipment to surgical teams and surgical departments with functional operating rooms, and as a result, the two companies frequently target the same customers. However, Getinge's business extends beyond making infection control equipment, and unlike Belimed, Getinge also plans and designs equipment for operating rooms, including operating room tables and operating room lighting.

From May 4, 2015 to December 31, 2021, Belimed employed defendant Jeffrey Bleecker ("Bleecker") as a Senior Planning and Design Manager in Belimed's "West

1

Region." ECF No. 15-2, Bleecker Aff. ¶ 6. In that role, Bleecker assisted Belimed's sales team in the West Region with planning, designing, and implementing Belimed's infection control equipment for hospitals. While Bleecker worked out of Arizona, he covered several western states in his role, including, in his last two years with Belimed, Washington, Oregon, California, Hawaii, Arizona, New Mexico, Nevada, Utah, Colorado, Idaho, Montana, and Wyoming.

At the start of his employment, Bleecker entered into a "Non-disclosure, Non-solicitation, and Non-competition Agreement" with Belimed (the "Agreement"). ECF No. 1-1. Under the terms of the Agreement, Bleecker agreed to use his best efforts to protect Belimed's trade secrets and confidential information and agreed that he would not use or disclose Belimed's confidential information for two years following his termination. Id. § 1(f)–(g). The Agreement also contained a non-competition provision that stated that during Bleecker's employment and for one year following his termination, Bleecker could not, without prior written consent, "directly or indirectly, obtain ownership in, work, advise, consult, or volunteer for or with, in any Competitive Capacity," either (i) Getinge or Steris Corporation ("Steris")—another one of Belimed's competitors—or (ii) "any entity that enters the United States market in direct competition with [Belimed] from the date of this Agreement until [Bleecker's] separation of employment." Id. § 3. Any breach of any of the restrictive covenants entitled Belimed to extend the time periods contained in the covenants. Section 8 of the Agreement further provided that "[a]ll matters affecting this Agreement are to be governed by, interpreted, and construed in accordance with the laws of the State of South Carolina." Id. § 8.

2

At the end of 2021, Bleecker allegedly represented to Belimed that he was leaving the company to return to his self-owned general contractor business. Prior to his departure, Bleecker allegedly sent several documents to his personal email, including his employment documents and an internal presentation containing allegedly proprietary information about a new web-based application that Belimed was in the process of developing. On or around January 10, 2022, Bleecker began working as a Healthcare Planning and Design Manager for Getinge. Bleecker joined Getinge's Surgical Workflows group, which was responsible for planning and designing operating room equipment and, according to Bleecker, his role at Getinge is thus "unrelated" to the job he performed at Belimed. Bleecker Aff. ¶ 16–17. On the other hand, Belimed alleges that in his new role at Getinge, Bleecker will necessarily interact with many of the same customers, architects, and general contractors that he worked with at Belimed, and it will not be possible for him to perform his new role without drawing upon the confidential information and goodwill that he built for Belimed.

On March 17, 2022, Belimed filed the instant action against Bleecker, alleging (1) breach of contract, (2) violation of the South Carolina Trade Secret Act ("SCTSA"), and (3) violation of the Defend Trade Secret Act, 18 U.S.C. § 1836 et. seq. ("DTSA").

On the same day, March 17, 2022, Belimed filed its motion for temporary restraining order and preliminary injunction. ECF No. 4. On March 21, 2022, the court verbally granted the temporary restraining order until further order from the court. See ECF No. 13. Bleecker responded to the motion on March 23, 2022, ECF No. 15, and Belimed replied on March 24, 2022, ECF No. 18. The court held a hearing on the motion

on March 25, 2022.  ECF No. 24.  As such, the motion has been fully briefed and is now ripe for review.

## II.  STANDARD

### A.  Personal Jurisdiction

When a defendant challenges personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction exists.  In re Celotex Corp., 124 F.3d 619, 628 (4th Cir. 1997).  When the court decides a personal jurisdiction challenge without an evidentiary hearing, the plaintiff must prove a prima facie case of personal jurisdiction.  Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993).  "In considering the challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  In re Celotex, 124 F.3d at 628 (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)).  Still, the court need not "credit conclusory allegations or draw farfetched inferences."  Masselli & Lane, PC v. Miller & Schuh, PA, 2000 WL 691100, at *1 (4th Cir. May 30, 2000) (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)).

### B.  Preliminary Injunction

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  A party seeking a preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits, (2) it is likely to

suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest. Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). "To obtain a preliminary injunction under the Winter test, a movant must make a 'clear showing' of [the] four requirements." Alkebulanyahh v. Nettles, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011); see also Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus requires that a party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits.") (internal quotation marks omitted). As the Supreme Court has noted, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22.

## III.  DISCUSSION

### A.  Personal Jurisdiction

As a threshold matter, Bleecker argues that the court does not have personal jurisdiction over Bleecker and, in essence, moves to dismiss this action for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Belimed is incorporated under the laws of Florida with a principal place of business in Ladson, South Carolina. Bleecker is a citizen and resident of Peoria, Arizona.

In evaluating a challenge to personal jurisdiction, the court engages in a two-step analysis. Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993). First, it must find that the forum state's long-arm statute authorizes the exercise of jurisdiction under the facts presented. Id. Second, if the statute does authorize jurisdiction, then the court must determine if its exercise of personal jurisdiction is

consistent with due process.  Id.  South Carolina's long-arm statute extends its reach to the outer limits allowed by the Due Process Clause.  Foster v. Arletty 3 Sarl, 278 F.3d 409, 414 (4th Cir. 2002); Cockrell v. Hillerich & Bradsby Co., 611 S.E.2d 505, 508 (S.C. 2005).  Consequently, the two-step inquiry compresses into a single question: whether the court's exercise of personal jurisdiction comports with due process.  Sonoco Prod. Co. v. Inteplast Corp., 867 F. Supp. 352, 354 (D.S.C. 1994).

Personal jurisdiction over a nonresident defendant can be either specific or general.  ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997).  For an individual defendant, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile."  Daimler AG v. Bauman, 571 U.S. 117, 137 (2014) (internal quotations and citation omitted).  There is no dispute that Bleecker is a domiciliary of Arizona, meaning he is not subject to general jurisdiction in South Carolina.

Specific jurisdiction, on the other hand, arises when a cause of action is related to the defendant's activities within the forum state.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984).  Exercising specific jurisdiction does not comport with due process unless the defendant has purposefully established sufficient "minimum contacts" with the forum state and the exercise of jurisdiction comports with notions of "fair play and substantial justice."  Burger King v. Rudzewicz, 471 U.S. 462, 475–76 (1985).  A defendant has minimum contacts with a state when "the defendant's conduct and connection with the forum state is such that he should reasonably anticipate being haled into court there."  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  Minimum contacts must be based on "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State,

6

thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475.

Upon a showing of the defendant's purposeful availment, the fairness inquiry balances

any burden on the defendant against countervailing concerns such as the plaintiff's

interest in obtaining relief and the forum state's interest in the controversy. World-Wide

Volkswagen, 444 U.S. at 292.

The Fourth Circuit applies a three-part test when evaluating the propriety of

exercising specific jurisdiction: (1) whether the defendant purposely availed itself of the

privileges of conducting activities in the forum state and thus invoked the benefits and

protections of its laws, (2) whether the plaintiff's claims arise out of or relate to those

forum-state activities, and (3) whether the exercise of jurisdiction is constitutionally

reasonable. Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan, 259 F.3d

209, 215–16 (4th Cir. 2001) (citing Helicopteros, 466 U.S. at 414–16; Burger King Corp.

v. Rudzewicz, 471 U.S. 462, 472, 476–77 (1985)). To show that the exercise of specific

jurisdiction over a defendant comports with due process, a plaintiff "must prevail on each

prong." Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 189 (4th Cir. 2016).

With respect to the first prong, Belimed must demonstrate that Bleecker purposely

availed himself to being sued in South Carolina by conducting activities in the state.

Under this prong, "it is the defendant, not the plaintiff or third parties, who must create

contacts with the forum State." Walden v. Fiore, 571 U.S. 277, 291 (2014). In other

words, the question is whether the defendant made a substantial "connection to the

forum, not just to parties who happen to live there." Hawkins v. i-TV Digitalis

Tavkozlesi zrt., 935 F.3d 211, 230 (4th Cir. 2019) (emphasis in original). "[A] person

cannot be haled into the forum simply because he knew that his conduct would have

7

incidental effects there; he must have 'expressly aimed' his conduct at the forum." Id. (quoting Walden, 571 U.S. at 288 n.7).

Belimed argues that Bleecker purposefully availed himself to a suit in South Carolina because he was recruited by Belimed employees who were based in South Carolina, interviewed for his position in South Carolina, regularly communicated with Belimed employees—including his supervisors—who were based on South Carolina, and frequently traveled to South Carolina for meetings, trainings, and other work activities.[1] Compl. at 4–5.  In response, Bleecker objects to the characterization of his South Carolina interactions as "regular."  ECF No. 15-1 at 8.  Bleecker asserts that he only traveled approximately two times per year to South Carolina from 2015 to 2019, zero times in 2020, and only once in 2021.

Other courts have found that similar contacts were sufficient to make a prima facie showing of jurisdiction to survive the jurisdictional challenge.  In Reynolds Foil Inc. v. Pai, for example, the Eastern District of Virginia found that the defendant "reached" into the forum state by accepting contractual employment terms and by maintaining employment with a company based in the forum state.  2010 WL 1225620, at *3 (E.D. Va. Mar. 25, 2010).  The court further found that "interviewing for employment in [the forum state] and traveling to [the forum state] for training purposes" were also

---

[1] As further evidence of purposeful availment, Belimed argues that the Agreement specified that South Carolina law is to govern any disputes between the parties.  "The inclusion of a choice of law clause is one factor that a court may take into account in determining whether the exercise of personal jurisdiction is justified, but it is no more than that."  Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 281 (4th Cir. 2009) (citing Burger King, 471 U.S. at 482).  Since the court finds that personal jurisdiction is properly exercised based on Bleecker's other contacts with the state, the court merely notes this fact for completeness.

evidence of sufficient contacts with the state.  Id. (citing FBR Cap. Mkts. & Co. v. Short, 2009 WL 3254458, at *3 (E.D. Va. Oct. 9, 2009)).  Bleecker argues that both Reynolds Foil and the case it relied upon, FBR Capital Markets, are based on a rule that has since been overturned by the Supreme Court in Walden.  Specifically, Bleecker argues that courts may no longer determine whether personal jurisdiction is proper based on whether the effects of a defendant's actions will be felt in the forum state.  But the court in Reynolds Foil did not premise its holding on the effects test; rather, it analyzed the "quality and nature" of the defendant's contacts with the forum state and determined, as the court does here, that the contacts rose above the level of casual and isolated contacts. Id. at *4.  The court finds persuasive the Eastern District of Virginia's handling of similar facts and therefore finds that Bleecker purposely availed himself of the benefits and protections of South Carolina law.

Under the second prong, Belimed must demonstrate that its claims against Bleecker arise from or relate to the forum-state activities.  This prong is satisfied if the "activity in the forum state is the genesis of [the] dispute," or "if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim."  Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 303 (4th Cir. 2012) (alteration in original and citations omitted).  Bleecker argues that even if the court were to adopt Belimed's rendition of the jurisdictional facts, Belimed's claims do not arise out of Bleecker's South Carolina activities.  However, the same courts that determined that an employee in Bleecker's position purposely avails himself to a suit in the forum state also found that claims similar to the ones here arise out of the employee's connections with the forum

9

state.  See, e.g., Reynolds Foil, 2010 WL 1225620, at *5 (finding that the plaintiff's contract claim is "properly categorized as a dispute over the terms and conditions of [the defendant's] employment with a Virginia[-]based company" and thus arose out of the defendant's connections with the Commonwealth of Virginia); FBR Cap. Mkts., 2009 WL 3254458, at *3 (finding that contacts with the forum state were related to the plaintiff's claim because the "suit is over the terms of [the defendant's] employment with [the plaintiff]").  This action, at its core, concerns the terms of Bleecker's employment with a South Carolina-based company and, therefore, arises out of Bleecker's connections with South Carolina.  To be sure, Bleecker states in his affidavit that he executed the Agreement in Phoenix, Arizona, which is a contact related to the breach of contract claim that occurred outside the state.  ECF No. 25 ¶ 2.  However, the instant action is still "based on a contract which had substantial connection with [South Carolina]" and on Bleecker's degree of interaction with individuals in South Carolina, many who may have played a role in establishing the terms of the Agreement.  See McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957).  Accordingly, the second prong has been established.

The third consideration under the specific jurisdiction analysis is meant to "protect[] a party from 'litigation so gravely difficult and inconvenient that [the] party unfairly is at a severe disadvantage in comparison to [its] opponent.'"  ESAB Grp. v. Zurich Ins. PLC, 685 F.3d 376, 392 (4th Cir. 2012) (quoting Burger King, 471 U.S. at 478) (alterations in original).  "To defeat jurisdiction on this basis, a defendant must establish, despite the presence of minimum contacts, 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  Id. (quoting

Burger King, 471 U.S. at 477).  In determining whether jurisdiction is constitutionally reasonable, courts evaluate "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Nolan, 259 F.3d at 217 (quoting Burger King, 471 U.S. at 477).

Exercising specific personal jurisdiction over Bleecker is constitutionally reasonable.  Certainly, Bleecker—a resident of Arizona—may face a burden litigating in South Carolina compared to Belimed—a company headquartered in South Carolina. However, this factor is somewhat allayed by the fact that Bleecker (or more probably, Getinge) has secured national and local counsel to defend him in this litigation, and in any case, the factor is not ultimately dispositive.  Other factors that weigh in favor of jurisdiction include South Carolina's interest in resolving controversies arising from contracts concerning the state's commerce and its interest in applying the state's own laws.  The court finds that Belimed has established the third prong for specific jurisdiction, and in sum, the court has personal jurisdiction over Bleecker.

### B.  Preliminary Injunction

The court turns next to Belimed's motion for a temporary restraining order ("TRO") and preliminary injunction.  Belimed first sought a TRO "to prevent further irreparable harm" prior to a preliminary injunction hearing.  ECF No. 4-1 at 7.  The court has verbally granted the TRO, pending this order, and as such, it considers Belimed's motion as solely one for a preliminary injunction.  Belimed requests a preliminary

11

injunction prohibiting Bleecker from continuing to work for Getinge in violation of the Agreement. To issue such an injunction, Belimed must make a clear showing as to each prong of the Winter test. The court analyzes the first prong of the Winter test, and, after finding that Belimed has not made a clear showing under this prong, denies the motion for preliminary injunction.

The first prong of the Winter test requires the party seeking the preliminary injunction to make a "clear showing" that it is likely to succeed on the merits. JAK Prods., Inc. v. Bayer, 616 F. App'x 94, 95 (4th Cir. 2015) (quoting Winter, 555 U.S. at 22). Although a movant "need not establish a 'certainty of success,'" it must "make a clear showing that [it] is likely to succeed at trial." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (quoting Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2014)). Belimed argues that the court may issue a preliminary injunction because it is likely to succeed on the merits of each of its causes of actions, and the court addresses the merits of each of those claims below.

### 1. Breach of Contract

The parties dispute whether Belimed has successfully shown that it is likely to succeed on its breach of contract claim in two separate respects. First, the parties dispute whether the Agreement is enforceable before arguing whether Bleecker in fact breached the Agreement. Regarding enforceability, Bleecker argues that Belimed's breach of contract claim will fail because the restrictive covenants in the Agreement are overbroad and void, while Belimed argues that the restrictive covenants are narrowly tailored. If Bleecker can show that the restrictive covenants are unreasonable—and therefore unenforceable—Belimed's motion for preliminary injunction must fail because it cannot

12

show a substantial likelihood of success on the merits of its breach of contract claim.  The

court concludes that there is not a strong likelihood that the Agreement is enforceable,

and at minimum, Belimed has not clearly shown that it is likely to succeed on the merits.

### a.  Enforceability

Both parties agree that the Agreement contains a valid choice-of-law provision

and that South Carolina law applies.  See ECF No. 15-1 at 10 n.4.  Under South Carolina

law, covenants not to compete are generally disfavored and are to be strictly construed

against the employer.  Faces Boutique, Ltd. v. Gibbs, 455 S.E.2d 707, 708 (S.C. Ct. App.

1995).  Despite that public policy, South Carolina courts generally permit restraints on

trade, like non-competition agreements, if they are narrowly tailored to protect the

employer's legitimate business interests.  See id.; Almers v. S.C. Nat'l Bank of

Charleston, 217 S.E.2d 135, 140 (1975).  Specifically, a covenant not to compete will be

upheld if it is:

> (1) necessary for the protection of the legitimate interest of the employer;
> (2) reasonably limited in its operation with respect to time and place; (3) not
> unduly harsh and oppressive in curtailing the legitimate efforts of the
> employee to earn a livelihood; (4) reasonable from the standpoint of sound
> public policy; and (5) supported by valuable consideration.

Stringer v. Herron, 424 S.E.2d 547, 548 (S.C. Ct. App. 1992).  South Carolina courts

have also suggested that non-disclosure and trade secrets agreements should be analyzed

using the same five-step test.  See Milliken & Co. v. Morin, 685 S.E.2d 828, 834 (S.C.

Ct. App. 2009) (applying the requirements for a covenant not to compete to inventions

assignment and confidentiality provisions); Carolina Chem. Equip. Co., Inc. v.

Muckenfuss, 471 S.E.2d 721, 723 (S.C. Ct. App. 1996) (same, for covenant not to

divulge trade secrets).  The court therefore considers each factor in turn for both the non-

competition provision and non-disclosure provision in the Agreement, both of which Bleecker argues are unenforceable.

### i.  Legitimate Interests

Under the first factor, Belimed asserts that the Agreement protects several of its legitimate interests, including its existing business contacts, customer goodwill, trade secrets, and proprietary information.  South Carolina has recognized that the "most important single asset of most businesses is their stock of customers.  Protection of this asset against appropriation by an employee is recognized as a legitimate interest of the employer."  Standard Register Co. v. Kerrigan, 119 S.E.2d 533, 539 (S.C. 1961).  Similarly, businesses have a legitimate interest in protecting confidential information and trade secrets.  Morin, 731 S.E.2d at 295.  Therefore, Belimed has satisfied this prong.

### ii.  Temporal and Geographic Scope.

Under the second factor, South Carolina courts determine whether the duration and geographic scope of a non-compete are reasonable on a case-by-case basis.  See Faces Boutique, 455 S.E.2d at 709.  In doing so, courts often look to past restrictive covenants that have been considered by other courts.  See id.  Bleecker does not contest the reasonableness of the one-year duration of the non-compete or the two-year duration of the non-disclosure provision.  Indeed, South Carolina courts have previously upheld restrictive covenants for three years.  See Rental Unif. Serv. of Florence, Inc. v. Dudley, 301 S.E.2d 142, 143 (S.C. 1983).  Instead, Bleecker argues that the non-compete "contains no geographic scope," making it "per se unenforceable."  ECF No. 15-1 at 12 (emphasis in original).  Bleecker is correct that in South Carolina, "a restrictive covenant without a geographic limitation is void and unenforceable."  Dove Data Prods., Inc. v.

14

DeVeaux, 2008 WL 9841167, at *4 (S.C. Ct. App. Mar. 24, 2008) (citing Stonhard, Inc. v. Carolina Flooring Specialists, Inc., 621 S.E.2d 352, 354 (S.C. 2005)).  In the absence of a geographic limitation in a non-compete clause, courts may not rewrite or "blue pencil" the clause by inserting a geographical limitation where none existed.  See Team IA, Inc. v. Lucas, 717 S.E.2d 103, 107 (S.C. Ct. App. 2011) ("[I]t would violate public policy to allow a court to insert a geographical limitation where none existed." (quoting Poynter Invs., Inc. v. Century Builders of Piedmont, Inc., 694 S.E.2d 15, 17 (S.C. 2010))). The geographic scope requirement only applies if there is no substitute for the geographic restriction.  For example, prohibitions against contacting existing customers can be a valid substitute for delineating a geographic limitation through "the 'traditional' manner of lines on a map."  Wolf v. Colonial Life & Accident Ins. Co., 420 S.E.2d 217, 222 (S.C. Ct. App. 1992).

Belimed argues that there are two reasons it can overcome the lack of geographic restriction in the non-compete.  First, Belimed argues that where companies compete globally, the breadth of a restrictive covenant may reflect that global competition, such that no geographic limitation is necessary.  In support, Belimed cites Wolf, but that case does not override the general rule that a non-compete without a geographic restriction is void and unenforceable as a matter of public policy.  The Wolf court's declaration that a company that "does business nationwide . . . needs nationwide protection" must be read in harmony with its initial finding that a prohibition against contacting existing customers could be a valid substitute for a geographic limitation.  Wolf, 420 S.E.2d at 222. Furthermore, even if the court accepted that the terms of the non-compete here were intended to protect Belimed from fierce national competition, Bleecker's official role was

15

limited to a particular region of the country (Washington, Oregon, California, Hawaii, Arizona, New Mexico, Nevada, Utah, Colorado, Idaho, Montana, and Wyoming).  To apply <u>Wolf</u>'s holding without due consideration of that fact would mean ignoring a long line of South Carolina cases that have held that a geographic restriction is overbroad when a former employee only services certain states within that geographic area.  <u>See, e.g.</u>, <u>Dudley</u>, 301 S.E.2d at 143 ("A geographic restriction is generally reasonable if the area covered by the restraint is limited to the territory in which the employee was able, during the term of his employment, to establish contact with his employer's customers."); <u>Standard Register</u>, 119 S.E.2d at 535 (upholding a non-solicitation agreement that precluded a former employee from "selling to the accounts or in the territory" where he had previously worked as a sales representative); <u>Sermons v. Caine & Estes Ins. Agency, Inc.</u>, 273 S.E.2d 338, 339 (S.C. 1980) (determining that a state-wide restrictive covenant was unreasonable where the former employee only worked within a fifty-mile radius). The other South Carolina case that Belimed relies upon is distinguishable for similar reasons.  <u>See</u> ECF No. 18 at 7 (citing <u>Williams v. Unum Grp.</u>, 2017 WL 10756823, at *10 (D.S.C. Oct. 18, 2017)).  In <u>Williams</u>, the court considered the enforceability of both a non-compete and non-solicitation provision in a former employee's employment agreements, finding that both provisions were enforceable for purposes of a motion for judgment on the pleadings.[2]  2017 WL 10756823, at *10–12.  <u>Williams</u> is distinguishable for multiple reasons.  First, under its analysis of the non-compete provision, the court determined that the provision was not overly broad as a matter of law, but critically, it

---

[2] In <u>Williams</u>, the plaintiff was the defendant's former employee and sought declaratory relief precluding enforcement of the employment agreements at issue.

premised part of its holding on the fact that even if the restrictions were overbroad, they could be blue-penciled by the court under Delaware law. Id. at 10–11. As discussed earlier, such an approach is not permitted under South Carolina law. Second, the non-compete in Williams specified that the employee could not work for a significant competitor in any country where the defendant conducted business unless the employee's primary duties and responsibilities with respect to the competitor were not related to the products and services offered by the defendant. There is no such provision in the non-compete here. Finally, under the non-solicitation clause, the court in Williams determined that the absence of a geographic limitation did not render the non-solicitation provision facially defective. Id. at *12 (citing Wolf, 420 S.E.2d at 222). In Williams, the plaintiff held a senior-management position and worked for the defendant across the globe. While there is evidence that Bleecker worked with senior members of Belimed and will do so at Getinge, there is no evidence that his personal reach was comparably wide. The absence of similar facts in the instant action undermines Belimed's argument that a worldwide restriction is necessary to protect its legitimate business interests.

Second, Belimed argues that an employer may draft an enforceable non-compete provision without a geographic limitation if the employer substitutes the geographic limitation with another. Belimed claims that it provided an adequate substitute by restricting Bleecker from employment with certain competitors: either at (i) Getinge or Steris or (ii) "any entity that enters the United States market in direct competition with [Belimed] from the date of this Agreement until [Bleecker's] separation of employment." ECF No. 1-1 § 3. There are two issues with Belimed's argument. First, while South Carolina courts have recognized an exception to the general rule that covenants must be

geographically restricted, the only valid substitute they have recognized is a customer-based restriction.  This is true for each of the applicable[3] cases cited by Belimed as well.  For example, in <u>Caine & Estes Insurance Agency, Inc. v. Watts</u>, the South Carolina Supreme Court specified that the agreement at issue was reasonable because "[g]eographically, the restriction is specific to only where respondent's clients are located.  Appellant is free to sell anywhere else . . . ."  293 S.E.2d 859, 860–61 (S.C. 1982).  There is no customer-limitation provision in the Agreement here.  Second, even if the court forged a new path and recognized a competitor-based restriction as a substitute for a geographic restriction, Belimed has not truly restricted Bleecker from employment among certain competitors.  The non-compete prevents Bleecker from working for "any entity that enters the United States market in direct competition" with Belimed.  ECF No. 1-1 § 3.  Such a restriction could theoretically apply to any competitor nationwide (if not worldwide) and is not a valid substitute.  On this point, Belimed argues that if the "direct competition" clause prevents the court from otherwise finding the Agreement enforceable, the court may strike the clause from the Agreement.  In support, Belimed attempts to distinguish blue-penciling—which is prohibited—from severing a clause in a restrictive covenant.  However, the case that Belimed cites, <u>Rockford Manufacturing, Ltd. v. Bennet</u>, specified that a "covenant is only severable where it 'is in effect a combination of several distinct covenants.'"  296 F. Supp. 2d 681, 688 (D.S.C. 2003)

---

[3] Belimed cites <u>Morin</u> as a case where the court enforced a competitor-based substitute.  However, <u>Morin</u> was a case concerning confidentiality and inventions assignment provisions.  685 S.E.2d at 834.  While such cases are analyzed with the same framework, there is arguably a greater need for competitor-based restrictions as it relates to confidential information.  <u>See</u> <u>Nucor I</u>, 482 F. Supp. at 723 n.5 (describing extensive law on employer liability for appropriating trade secrets).

(quoting <u>Somerset v. Reyner</u>, 104 S.E.2d 344, 348 (1958)).  Even courts that have

recognized the severability of a contract have held that the rule "does not mean that a

single covenant may be artificially split up in order to pick out some part of it that it can

be upheld."  <u>Somerset</u>, 104 S.E.2d at 347–48 (citation omitted).  In <u>Rockford</u>, the court

found that the covenant at issue was divisible because it chose to identify each company

individually "by choosing to list them by name" such that the covenant could be

construed as several distinct covenants against each of the affiliated companies.

<u>Rockford</u>, 296 F. Supp. 2d at 688.  Here, the clause at issue is not clearly divisible, and

the court cannot be sure that severing the "direct competition" clause would not disregard

the "intent of the parties" to draft a broad competitor provision.  <u>See id.</u> at 688.  Since

severing the clause would essentially rewrite the Agreement, the court refuses to blue-

pencil the Agreement.

Therefore, in the absence of a specific geographic limitation in the Agreement, the

Agreement is possibly unenforceable <u>per se</u>, regardless of whether the non-compete is to

be analyzed as a national or global geographic restriction[4] or if such a restriction should

be inferred from its absence.[5]

---

[4] <u>See</u> <u>Herring v. LaPolla Indus., Inc.</u>, 2013 WL 12148770, at *3 (D.S.C. Oct. 7, 2013) (finding that a non-compete that limited the employee's activities in the "entirety of North America" was overbroad on its face); <u>Lucas</u>, 717 S.E.2d at 242, 246 (finding a covenant not to compete restricting the defendant from providing services in "the entire continental United States" would have been "overly broad on its face" were it not for another provision limiting the restricted territory to four states).

[5] <u>See</u> <u>Int'l Safety Access Corp. v. Integrity Worldwide, Inc.</u>, 2010 WL 11552932, at *2 (D.S.C. Oct. 27, 2010) (finding that where a restrictive covenant was not limited with respect to place, the "geographical scope of th[e] clause could not be any broader" and was therefore "<u>per se</u> unreasonable").

### iii.  Legitimate Efforts of the Employee to Earn a Livelihood

In the alternative, Bleecker argues that the Agreement is unenforceable because it was not tailored to Bleecker's job responsibilities at Belimed.  Belimed argues that an activity restraint is not a required element of a non-compete in South Carolina, but the court construes Bleecker's argument as one that falls under this third factor.  The Agreement restricts Bleecker from working "in any Competitive Capacity" for Getinge, Steris, or any entity that enters the United States market in direct competition with Belimed.  As Bleecker notes, the term "Competitive Capacity" is a capitalized, yet undefined, term.  Bleecker argues that as a result, the non-compete functionally prevents him from working in any position at Getinge, even if that position were wholly unrelated to his role at Belimed.  In response, Belimed argues that contrary to Bleecker's assertion, the Agreement is indeed restricted by activity because the "Competitive Capacity" language "only bars Bleecker from competitive activity."  ECF No. 18 at 10.

Courts have generally found that these so-called "any capacity" restrictions are overbroad and unenforceable.  See Baugh v. Columbia Heart Clinic, P.A., 738 S.E.2d 480, 489 (S.C. Ct. App. 2013) (citing Preferred Research v. Reeve, 357 S.E.2d 489, 490 (S.C. 1987) and Faces Boutique, 455 S.E.2d at 708, but finding that a non-compete that prohibited cardiologists from assisting any person engaging in cardiology was not overbroad).  While Belimed claims that "Competitive Capacity" is a plain term, and it is easily ascertainable whether one is working in a "Competitive Capacity," the court disagrees.  At minimum, there are blurred lines as to what constitutes work in a "Competitive Capacity," and any such ambiguity is to be construed against the employer.  Int'l Safety, 2010 WL 11552932, at *2 ("When the non-compete clause is ambiguous and

20

susceptible to two or more differing interpretations, at least one of which is functionally overbroad, the clause is unenforceable.  The limitless scope and expansive interpretations of this provision, at the discretion of the enforcer, is self-evident." (internal quotation marks and citation omitted)).  For example, it is unclear[6] whether Bleecker would have breached the Agreement if he had accepted a job in human resources at Getinge.  Based on the ambiguity, the "Competitive Capacity" clause must be read as prohibiting Bleecker from working at any of Belimed's competitors in almost any capacity, which, according to Bleecker, hinders his legitimate efforts to earn a livelihood.

The parties also disagree on whether the non-disclosure provision in the Agreement is enforceable on its face.  While the court's conclusion on the non-compete provision alone supports denial of the preliminary injunction, for similar reasons, the court finds that Belimed has not clearly shown that the non-disclosure provision is enforceable.  As this court previously explained in another case, a provision that does not define "trade secret" or "defines 'confidential information' so broadly that virtually all of the information" that an employee acquires during his employment "would fall within its definition" is overbroad.  Nucor Corp. v. Bell ("Nucor I"), 482 F. Supp. 2d 714, 729 (D.S.C. 2007).  Here, the Agreement adequately defines "Trade Secret(s)," see ECF No. 1-1 ¶ 1(b), but defines "Confidential Information" as "any information which does not

---

[6] Bleecker claims that during a pre-litigation call, counsel for Belimed stated that Bleecker could not work in Getinge's human resources department without violating the non-compete.  Belimed hotly contests this account, arguing that during the call, counsel for Belimed did not wish to entertain the hypothetical.  The court reaches no conclusion on whether such a statement was made but independently raises the hypothetical to note that it is telling that even after the hearing, it remains unclear whether a job in human resources would indeed be in the same "Competitive Capacity."  This ambiguity weighs against Belimed.

rise to the level of a Trade Secret, but which [Belimed] uses in its business and treats as and considers to be confidential or proprietary," ECF No. 1-1 ¶ 1(c).  Moreover, the non-disclosure provision uses the same "directly and indirectly" language that other courts have questioned.  See Int'l Safety, 2010 WL 11552932, at *3 (finding that a clause that contained the phrase "involved directly or indirectly" was "ambiguous, undefined, and vague").  "For all intents and purposes, such a broadly written non-disclosure covenant not only forbids [Bleecker] from divulging trade secrets, but also forbids [Bleecker] from engaging in any employment similar to his employment with [Belimed]."  Nucor I, 482 F. Supp. 2d at 730.  In such instances, the non-disclosure provision operates as a non-compete, and the court's findings on the non-compete provision apply to the non-disclosure provision.  Williams, 2017 WL 10756823, at *14 ("[W]here non-disclosure provisions operate as non-compete provisions, they must satisfy the more restrictive requirements applicable to non-compete provisions." (citing Fay v. Total Quality Logistics, LLC, 799 S.E.2d 318, 323 (S.C. Ct. App. 2017)).  In sum, the court finds that Belimed has not shown a likelihood of success on the merits of its breach of contract claim regarding the enforceability of both the non-compete and non-disclosure provisions.

### iv.  Public Policy

The court has addressed the relevant public policy considerations in the context of the other factors.  The parties do not raise any additional public policy concerns.

### v.  Valuable Consideration

Under the fifth factor, the South Carolina Supreme Court has held that a covenant entered into at the inception of employment "may be enforced where the consideration is

22

based solely upon the at-will employment itself." <u>Poole v. Incentives Unlimited, Inc.,</u> 548 S.E.2d 207, 209 (S.C. 2001). Bleecker entered into the Agreement at the inception of his employment with Belimed and acknowledged that his at-will employment was consideration for signing the Agreement. <u>See</u> Bleecker Aff. ¶ 4. Although Belimed has established this factor, the court nevertheless finds that Belimed has not made a clear showing of the other requirements for the reasons discussed above.

### b. Breach of the Agreement

Second, Belimed argues that it is likely to succeed on the merits of its breach of contract claim because Bleecker in fact breached the Agreement. Bleecker responds that even if the restrictive covenants in the Agreement could be enforced, Bleecker did not breach those restrictions. This is largely a factual dispute. Bleecker contends that he joined the group responsible for operating room equipment at Getinge, and Belimed does not make operating room equipment. In its motion, Belimed argues that sterilization is part of the Surgical Workflows group at Getinge—the group that Bleecker joined—and Getinge promotes its operating room and sterilization equipment together. Belimed also presents evidence that Bleecker himself considers his role a return to the same or similar capacity and that Bleecker will be working for sales executives involved with sterilization equipment. Belimed, citing declarations from its employees, further avers that several contacts from Bleecker's time at Belimed are waiting to hear from him in his new role. ECF No. 1-2, Polston Decl. ¶ 77. The court acknowledges Belimed's evidence of a breach of the Agreement, but since the court determined that the Agreement is arguably unenforceable on its face, the court does not need to resolve whether Bleecker breached the Agreement. Stated another way, even if Belimed is correct that Bleecker is servicing

the same customers in his new role, that would not alter the court's preliminary finding that the Agreement is unenforceable.  Accordingly, the court denies the motion for a preliminary injunction to prevent Bleecker from working at Getinge based on a claimed violation of the Agreement.

### 2. Trade Secrets Claims

Next, the court considers whether Belimed is likely to succeed on the merits of its trade secrets claims under the SCTSA and the DTSA.[7]  As a preliminary matter, Belimed's trade secrets claims are independent of the Agreement.  Both South Carolina and federal law impose a duty upon employees to refrain from using or disclosing certain trade secrets, regardless of whether they have signed a written contract.  S.C. Code Ann. § 39-8-30(B) (stating that the obligation to refrain from using an employer's trade secret is "independent of" and "in addition to any written contract of employment"); see Prysmian Cables & Sys. USA, LLC v. Szymanski, 2021 WL 5578145, at *15 (D.S.C. Nov. 29, 2021) (observing that nothing in the DTSA requires a written contract).  In other words, even if the court finds that the non-disclosure provision in the Agreement is unenforceable, Belimed may still succeed in showing that Bleecker misappropriated trade secrets in violation of the SCTSA.

In order to establish the misappropriation of a trade secret, a plaintiff must prove the following five elements:

> (1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the employee; (3) disclosed by the employee in breach of that

---

[7] Belimed notes in a footnote that all its arguments under the SCTSA are arguments under the DTSA due to the substantially similar elements between the statutes. ECF No. 4-1 at 18 n.5.  The court agrees that the statutes involve similar elements, and the court likewise applies the parties' arguments under the SCTSA to Belimed's DTSA claim.

confidence; (4) acquired by the defendant with knowledge of the breach of confidence; and (5) used by the defendant to the detriment of the plaintiff.

Nucor I, 482 F. Supp. 2d at 725 (citation omitted). The SCTSA defines "Trade secret" as:

> (a) information including, but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code that:
>
> > (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and
> >
> > (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

S.C. Code § 39-8-20(5). The burden of establishing the existence of a trade secret is on the plaintiff. Lowndes Prods., Inc. v. Brower, 191 S.E.2d 761, 765 (S.C. 1972). Belimed argues that Bleecker is in possession of the following trade secrets:

- "[F]unctionality concerns for new products and proposed product changes," ECF No. 4-1 at 19 (citing Polston Decl. ¶¶ 11–13)
- "[C]onfidential information concerning perceived deficiencies in Belimed's product," id. (citing Polston Decl. ¶¶ 11–13)
- "[T]echnical aspects of Belimed's products that were critical to Belimed's efforts to differentiate its products from those of its competitors, including Getinge," id. (citing Polston Decl. ¶¶ 11–13)
- "[C]onfidential information about[] Belimed's sales efforts," which included "proposals to potential customers," "Belimed's comprehensive proprietary suite of tools for planning and designing customized installations of equipment," and "Belimed's current and potential customer lists," id. (citing Polston Decl. ¶¶ 11–13)
- "[G]oodwill with [Belimed's] customers and potential customers," id. at 19–20
- "[A] screenshot of an internal presentation on a web-based application Belimed was developing," id. at 25

A misappropriation of a trade secrets claim requires the employer to specifically identify the trade secrets at issue. Muckenfuss, 471 S.E.2d at 724–25. An employer cannot extend this concept to reach "virtually all of the information [the former

25

employee] acquired during his employment." Id. "[T]he analysis set forth in Muckenfuss holds one must actually take an alleged trade secret, such as actual customer lists, pricing lists, or formula cards, or at least commit to memory what is clearly a trade secret, to violate the Act, and where a former employee uses the general knowledge he acquired while employed, or recollects general pricing information, no trade secret cause of action lies." Dove Data Prods., Inc. v. Murray, 2007 WL 9735256, at *4 (D.S.C. Apr. 30, 2007).  Just as the court found in Nucor I that it was premature to determine whether certain information qualified as a trade secret at the motion to dismiss stage, the court similarly finds that Belimed has not met the preliminary injunction standard for showing that Bleecker's information constitute trade secrets as opposed to information that falls within Bleecker's general knowledge. Cf. Nucor I, 482 F. Supp. 2d at 727 (citing Callaway Golf Co. v. Dunlop Slazenger Grp. Ams., Inc., 295 F. Supp. 2d 430, 437 (D. Del. 2003)).  Indeed, Belimed tacitly acknowledges that the purported trade secrets mostly involved "mere access to . . . information," with the exception of the screenshot, which was the only "concrete trade secret[]" it is currently aware of in Bleecker's possession.  ECF No. 4-1 at 25.  In response to the screenshot, Bleecker argues that the screenshot is not a trade secret because it was allegedly provided to everyone at the company and it is largely based on information available publicly online.  The fact that some portions of the information conveyed in the screenshot are available online does not bar the court from concluding that the screenshot could constitute a trade secret.  "Even if some portions of a compilation of confidential information are publicly available, it can still be considered, in its entirety, as a trade secret." Szymanski, 2021 WL 5578145, at *11 (citing IHS Global Ltd., 2021 WL 2134909, at *7).  However, in Szymanski and the

cases that the court relied upon, the purported trade secret was usually a compiled customer list such that the "trade secret" was the "unique combination" of public information itself. Id. at *16 (quoting Woven Elecs. Corp. v. Advance Grp., Inc., 930 F.2d 913 (4th Cir. 1991) (unpublished table opinion)). Here, the court has reviewed the side-by-side comparison of the screenshot at issue and the images from Belimed's website, and the court cannot conclusively determine whether the diagram[8] in the screenshot communicates the same information found on Belimed's website in a different format, if it contains new proprietary information, or if it is a unique combination of public information. As such, the court must conclude that Belimed has not clearly shown it is likely to succeed in proving the existence of trade secrets.

Assuming arguendo that Bleecker is in possession of trade secrets, however, the court proceeds to the second factor: whether the trade secret was communicated in confidence to Bleecker. Belimed presents evidence that it took reasonable steps to protect the secrecy of its proprietary information. Belimed's computer systems are password protected, it restricts certain folders and documents to specific employees, and it labels certain documents as confidential. Belimed is likely to succeed on the merits of its trade secrets claim with respect to the second element.

Finally, under the third element, Belimed must prove that Bleecker disclosed the trade secret. Belimed argues that for purposes of a preliminary injunction, it need not establish that Bleecker has already disclosed a trade secret because a preliminary injunction may be necessary to prevent a threatened misappropriation. The court agrees

---

[8] The screenshot was filed under seal, and as such, the court takes care to issue its ruling without disclosing information regarding the contents of the screenshot.

that under the SCTSA, either an "[a]ctual or <u>threatened</u> misappropriation may be enjoined."  S.C. Code § 39-8-50(A) (emphasis added); see also Nucor Corp. v. Bell ("Nucor II"), 2008 WL 9894350, at *8 (D.S.C. Mar. 14, 2008) (noting that although a plaintiff must generally prove that the defendant misappropriated the trade secret, the SCTSA authorizes the issuance of injunction to prevent the threatened misappropriation of a trade secret).  In the absence of any meaningful evidence of disclosure, "[t]he question remains whether South Carolina would apply the 'inevitable disclosure' doctrine to claims under the SCTSA."  Williams, 2017 WL 10756823, at *16.

The inevitable disclosure doctrine typically supports granting preliminary relief if "the plaintiff has an employee who knows its trade secrets who later accepts a position with the plaintiff's direct competitor" and "the plaintiff can show that its former employee will necessarily have to disclose or use its trade secrets to carry out the duties of his new position."  Nucor II, 2008 WL 9894350, at *15.  In Nucor II, this court surveyed the South Carolina legal landscape on trade secrets law and determined that no court had addressed whether the inevitable disclosure doctrine applies in the state.  Id.  In the absence of any direct authority, the court predicted that South Carolina courts would apply the doctrine.  Id. at *19 ("South Carolina would likely apply a narrow version of the inevitable disclosure doctrine because of its public policy disfavoring restraints on trade.").  Citing Nucor II, Belimed argues that the court should similarly apply the inevitable disclosure doctrine here and find that "Bleecker cannot reasonably or realistically avoid disclosing Belimed's trade secrets . . . while executing his duties at Getinge."  ECF No. 4-1 at 24.

It remains the case that no South Carolina state court has spoken on the issue.[9] Bleecker argues that since Nucor II, other courts in this district have weighed in on the issue and have suggested that the doctrine should not apply here. In Smith, the court properly observed that no South Carolina court has adopted the inevitable disclosure doctrine. 2011 WL 939211, at *3. While the court did "not doubt that 'inevitable disclosure' could be properly pled as part of a misappropriation claim," it further observed that to survive a motion to dismiss, a plaintiff must include factual allegations in the complaint for one to conclude that inevitable disclosure is plausible. Id. Similarly, in Williams, the court recognized "the possibility [that] South Carolina will adopt some version of the inevitable disclosure doctrine under the SCTSA" and in light of that possibility, it denied the defendant's motion to dismiss the plaintiff's SCTSA claim. 2017 WL 10756823, at *17.

In sum, the court finds no reason to depart from recognizing the inevitable disclosure doctrine to determine whether there is a threatened misappropriation. However, the court agrees with those cases that have been issued since Nucor II that determined that application of the doctrine should only occur if they are accompanied "in the context of allegations of actual misappropriations." Smith, 2011 WL 939211, at *3 (citing Nucor II, 2008 WL 9894350, at *15–19). Even in Nucor II, the court extensively discussed the evidence of direct misappropriation in the context of whether there was likely to be inevitable disclosure. 2008 WL 9894350, at *20 ("[P]laintiff has some

---

[9] Contrary to Bleecker's suggestion, the South Carolina Court of Appeals in Fay had no occasion to weigh in on the inevitable disclosure doctrine because the court was analyzing the validity of a non-disclosure provision, which, for reasons discussed above, is distinct from the inquiry under the SCTSA. 799 S.E.2d at 323.

evidence that Bell already misappropriated its trade secrets.  More importantly, the court

has already concluded in connection with the motion for sanctions that Bell acted in bad

faith by throwing away the SanDisk thumb-drive containing documents with Nucor's

potential trade secrets.").  Similarly, in Szymanski, where the court found that there was

threatened misappropriation, the court was presented with evidence that the defendant

took a "business blueprint" from the plaintiff and initiated plans for a competitor to build

an analogous manufacturing plant.  2021 WL 5578145, at *17.  No such evidence exists

here.[10]  At most, Belimed has shown that Bleecker is in possession of a screenshot

containing an allegedly proprietary business model, but it has not shown any evidence

that Bleecker has even partially disclosed the information or that his duties at Getinge

will require him to disclose the information.  Indeed, at the hearing, Belimed contended

that Bleecker obtained the screenshot even though it had nothing to do with his job.

Because the court finds that Belimed has not clearly shown the existence of trade secrets

---

[10] In Nucor II, the court determined that other courts that applied the inevitable
disclosure doctrine consider six main factors: (1) whether the former employer possesses
a "trade secret," (2) the employee's position at his former employer; (3) whether the
employee possesses an "extensive and intimate knowledge" of his former employer's
trade secrets; (4) the degree to which the employee's former employer and new employer
are unable or unwilling to safeguard the former employer's trade secrets.  PepsiCo, Inc. v.
Redmond, 54 F.3d 1262, 1270–72 (7th Cir. 1995).  Even if the court were to apply the
PepsiCo factors, as Belimed requests, it would find that Belimed is unlikely to succeed in
proving inevitable disclosure at this stage.  Under the third factor, Belimed has failed to
specify how Bleecker possesses "extensive and intimate knowledge" as to Belimed's
sales efforts.  And under the fifth and sixth factors, Belimed has only stated in general
terms that Getinge "cannot be relied on to provide any additional safeguards" to protect
Belimed's trade secrets, without any further explanation.  ECF No. 4-1 at 29.

or an actual or threatened misappropriation, Belimed cannot show a violation of the SCTSA at this stage.

In failing to clearly establish at least one element of each of its breach of contract and trade secrets claims, Belimed has not shown it is likely to succeed on the merits of its claims. For that reason, the court need not consider whether the remaining three <u>Winter</u> factors for issuing a preliminary injunction have been met. Even if a preliminary injunction is warranted in other respects, "the Fourth Circuit no longer recognizes a 'flexible interplay among the four criteria for a preliminary injunction.'" <u>Szymanski</u>, 2021 WL 5578145, at *9 (quoting <u>Real Truth About Obama, Inc. v. Fed. Election Comm'n</u>, 575 F.3d 342, 347 (4th Cir. 2009), <u>vacated on other grounds</u>, 559 U.S. 1089 (2010)). The Fourth Circuit has instead specified that each requirement of the <u>Winter</u> test must be evaluated separately. <u>Pashby</u>, 709 F.3d at 321. For example, even if Belimed is correct that it is at a great risk of suffering irreparable harm, that factor does not outweigh the likelihood of success factor. <u>See</u> <u>Real Truth</u>, 575 F.3d at 346–47. Therefore, the court denies the motion for preliminary injunction.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 29, 2022**
**Charleston, South Carolina**